IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:16-CV-84-D

TAKEYLA PERRY,  )
    )
        Plaintiff,  )
    )
v.   )    **ORDER**
    )
DIVERSIFIED WOOD PRODUCTS, INC.,  )
    )
        Defendant.  )

On November 14, 2016, Takeyla Perry ("Perry" or "plaintiff") filed a complaint against Diversified Wood Products ("Diversified" or "defendant") in Washington County Superior Court, alleging wrongful discharge in violation of North Carolina public policy, sex discrimination in violation of Title VII, and retaliation in violation of Title VII [D.E. 1-2]. On December 7, 2016, Diversified removed the case to this court, invoking federal question jurisdiction on the Title VII claims and supplemental jurisdiction on the North Carolina public policy claim [D.E. 1]. On November 30, 2017, Diversified moved for summary judgment on all claims [D.E. 20], filed a statement of material facts and appendix, [D.E. 21, 22], and filed a memorandum in support [D.E. 23]. On January 16, 2018, Perry filed a statement of facts in response [D.E. 25] and a memorandum in opposition [D.E. 25-1]. As explained below, the court grants in part and denies in part Diversified's motion for summary judgment.

I.

Diversified manufactures wood pallets at a small plant in Plymouth, North Carolina. Thomas J. Harrison is Diversified's owner and President, but during the relevant time period Harrison delegated the day-to-day operations to plant manager Steven Engelhardt ("Engelhardt"). In February

2015, Perry, who lived near the Diversified plant, applied for a job at the plant. See [D.E. 22-1] 47–50. Diversified did not immediately hire Perry, but took her information. See id.; [D.E. 22-5] 24–25; [D.E. 22-7]. Thereafter, Perry repeatedly asked Engelhardt for a job. See [D.E. 22-5] 25. In March 2015, Diversified offered Perry a job as a general laborer and machine operator. See id. at 24–25, 32–33. Perry's job duties included operating machines to cut and assemble parts for wood pallets. See [D.E. 22-1] 48–54. Perry was the only woman who worked on the plant floor. See [D.E. 22-5] 31.

On March 16, 2015, Perry began working at Diversified. See [D.E. 22-1] 50–54, 62–63; [D.E. 22-8]. Engelhardt gave her a safety orientation, and Craig Davis trained her on the machines. See [D.E. 22-1] 52–53, 103. Engelhardt told Perry that if she had any problems to talk to Sam Norman, who was a forklift driver and the "floor supervisor." See id. at 54. Engelhardt also told Perry that if she had any problems, she could talk directly to him. See id.

Throughout Perry's employment, Norman frequently made inappropriate sexual remarks to Perry. See [D.E. 22-1] 64–77, 108–10, 113–15; [D.E. 22-11]; [D.E. 25-2] ¶¶ 4–12. Norman also propositioned her, groped her legs, thighs, genitalia, breasts, and buttocks, and exposed himself to her. See [D.E. 22-1] 66–70; [D.E. 1-2] ¶¶ 22–23. On June 23, 2015, Norman's harassment of Perry culminated with his arrest for misdemeanor assault on a female in the first degree and misdemeanor indecent exposure in the first degree. See [D.E. 22-29]; [D.E. 22-30]. On June 26, 2015, Perry formally reported Norman's sexual harassment to Engelhardt. See [D.E. 22-11]. On June 26, 2015, Diversified suspended Norman pending an investigation. See [D.E. 22-5] 62–63; [D.E. 22-24].

After Norman's suspension, Perry continued to work at Diversified. Engelhardt spoke to every other employee who worked in the plant, and the other employees told Engelhardt that they never observed Norman harassing Perry. See [D.E. 22-5] 28–29, 46, 48, 63–64. On July 7, 2015,

2

Diversified issued its first written policy concerning sexual harassment. See [D.E. 22-12]; [D.E. 25-1] 4. On July 8, 2015, Diversified conducted training for all employees on the new policy. See [D.E. 22-13]. On July 9, 2015, Diversified terminated Norman's employment. See [D.E. 25-1] 4.

After Diversified terminated Norman's employment, Perry continued to work at Diversified. Perry alleges that between July 10, 2015, and July 20, 2015, one coworker asked her if she was menstruating, another coworker removed her water bottles from the plant's refrigerator, and another coworker blew marijuana smoke into a fan near where she was working. See [D.E. 22-1] 84–86; [D.E. 25-1] 4. Perry believes that these coworkers engaged in this conduct in retaliation for her complaining about Norman. Perry also believes that Engelhardt was aware of these incidents, but did nothing in response. See [D.E. 22-1] 119. On July 20, 2015, Perry left work and stated that she "had enough" and was not returning. See [D.E. 22-1] 84–87, 112–113; [D.E. 22-14] 9; [D.E. 22-22]; [D.E. 22-23]. One week later, Engelhardt contacted Perry and asked if she planned to return to work. See [D.E. 22-23]. Because Perry did not respond, Engelhardt concluded that she resigned her employment. See id.; [D.E. 22-5] 71; [D.E. 22-1] 112.

II.

Summary judgment is appropriate when, after reviewing the record as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v.

3

Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Scott v. Harris, 550 U.S. 372, 378 (2007).

A.

To sustain a hostile work environment claim under Title VII, an employee must prove that (1) she experienced unwelcome conduct; (2) the conduct was based on a protected characteristic under Title VII; (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) the conduct is imputable to the employer. See, e.g., EEOC v. Fairbrook Med. Clinic, P.A., 609 F.3d 320, 327 (4th Cir. 2010); Ziskie v. Mineta, 547 F.3d 220, 224 (4th Cir. 2008); Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (en banc). An employee also must show that her protected characteristic under Title VII was the "but for" cause of the alleged harassment. See, e.g., Gilliam v. S.C. Dep't of Juvenile Justice, 474 F.3d 134, 142 (4th Cir. 2007).

To determine whether conduct was sufficiently severe or pervasive to alter the employee's terms and conditions of employment and to create an abusive working environment, the court examines the allegations both subjectively and objectively. See, e.g., Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993). First, the employee must subjectively consider the conduct to be sufficiently severe or pervasive as to alter her conditions of employment. See, e.g., Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270–71 (2001) (per curiam); Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998); Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (en banc). Second, a court views the conduct from the perspective of a reasonable person in the

4

employee's position to determine whether it is objectively severe or pervasive. See, e.g., Breeden, 532 U.S. at 271; Faragher, 524 U.S. at 787–88; Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81–82 (1998); Boyer-Liberto, 786 F.3d at 277.

The objective component helps courts "to police the baseline for hostile environment claims." Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc) (quotation omitted). The court considers the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. The conduct must be severe or pervasive to be actionable. See id.; Faragher, 524 U.S. at 787–88; Boyer-Liberto, 786 F.3d at 277–78. Title VII does not create "a general civility code for the American workplace." Oncale, 523 U.S. at 80. The "conduct must . . . amount to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788; see Boyer-Liberto, 786 F.3d at 277–81. "[D]iscriminatory intimidation, ridicule, and insult" based on the protected characteristic must permeate the work environment in a manner "sufficiently severe or pervasive to alter the conditions" of the plaintiff's employment and to "create an abusive working environment." Harris, 510 U.S. at 21 (quotations omitted). Simple teasing, sporadic rude language, offhand comments, jokes related to a protected status, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. See Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68–69 (2006); Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 788; cf. Boyer-Liberto, 786 F.3d at 277–81. Likewise, mere rude or insensitive treatment cannot sustain a hostile work environment claim. See, e.g., Baqir v. Principi, 434 F.3d 733, 746–47 (4th Cir. 2006); see also Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 787–88; Oncale, 523 U.S. at 81–82; Brown v. Wake Cty. Gov't, No. 5:16-CV-806-D, 2017 WL 2982971, at *5 (E.D.N.C. July 12, 2017)

5

(unpublished); cf. Boyer-Liberto, 786 F.3d at 277–81; Walker v. Mod-U-Kraf Homes, LLC, 775 F.3d 202, 207–10 (4th Cir. 2014); Freeman v. Dal-Tile Corp., 750 F.3d 413, 420–24 (4th Cir. 2014); Okoli v. City of Balt., 648 F.3d 216, 220–22 (4th Cir. 2011).

Employers are strictly liable for sexual harassment perpetrated by an employee's supervisor, if that harassment culminates in a tangible employment action. See Vance v. Ball State Univ., 570 U.S. 421, 424 (2013). If the harassment does not culminate in "tangible employment action," the employer "may escape liability by establishing as an affirmative defense," that (1) the employer exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities that the employer provided. Id.

A "supervisor" for Title VII purposes is someone who is "empowered by the employer to take tangible employment actions against the victim." Id. "The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control. . . . Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates." Id. at 440.

Norman held the title of "floor supervisor," but genuine issues of material fact exist concerning Norman's authority to hire and fire employees on the plant floor, to move or assign employees on the plant floor, and to discipline or to recommend for discipline employees on the plant floor. See [D.E. 1-2] 10–12; [D.E. 22-1] 103–05; [D.E. 22-5] 15, 58–60; [D.E. 25-2] ¶ 4. In urging this court to hold as a matter of law that Norman was not Perry's supervisor, Diversified notes that Perry testified that she sometimes told Norman to back off when he made sexually harassing comments. See [D.E. 23] 15–16; cf. Mikels v. City of Durham, 183 F.3d 323, 334 (4th Cir. 1999). Even if true, that fact does not demonstrate as a matter of law that Norman was not Perry's

6

supervisor. See, e.g., Vance, 570 U.S. at 439–40.

Even if Norman was simply Perry's coworker, Diversified may be liable "in negligence" for Norman's alleged harassment "if it knew or should have known about the harassment and failed to take effective action to stop it." Ocheltree, 335 F.3d at 334. Engelhardt contends that he did not know about Norman's sexual harassment until Perry reported it to him on June 26, 2015, following Norman's arrest. See [D.E. 22-5] 27–30, 45–46. However, record evidence suggests that Norman often sexually harassed Perry right outside Engelhardt's open office door, that Engelhardt saw Norman touch Perry inappropriately, and that Engelhardt once intervened to diffuse a tense situation between Perry and Norman arising from Norman's sexually inappropriate conduct. See [D.E. 22-1] 62–70, 108–10; [D.E. 25-2] ¶¶ 4–12. Viewing the record in the light most favorable to Perry, genuine issues of material fact exist about what Engelhardt knew, or should have known, about Norman's behavior, and what Engelhardt did to address Norman's behavior.

Diversified also argues that Norman's behavior was not severe or pervasive enough to create a sexually hostile work environment under Title VII. See [D.E. 23] 11–14. Viewing the record in the light most favorable to Perry, genuine issues of material fact exist concerning the severity and pervasiveness of Norman's behavior. See [D.E. 22-1] 62–77, 107, 112–15; [D.E. 22-11]; [D.E. 25-2] ¶¶ 4–12.

Finally, Diversified notes that it did not take adverse employment action against Perry and seeks to assert an affirmative defense to Perry's sexual harassment claim. In making this argument, Diversified concedes that it did not promulgate a written policy concerning sexual harassment until July 7, 2015. See [D.E. 22-12]. Nonetheless, Diversified argues that it took reasonable steps to prevent and promptly correct any sexually harassing behavior. In support, Diversified notes that it is a very small company and that Engelhardt told Perry when she began employment that, if she had

7

any problems, she could talk directly to him. See [D.E. 22-1] 54. Diversified also cites posters from the Department of Labor and the Equal Employment Opportunity Commission ("EEOC") that Diversified claims discussed each employee's rights under federal employment law and were posted in the plant throughout Perry's employment. See [D.E. 22-9]. Diversified also cites Perry's alleged failure to report the harassment to Engelhardt until June 26, 2015, its suspension of Norman on June 26, 2015, the ensuing investigation, the promulgation of a formal policy on July 7, 2015, the training on July 8, 2015, and Norman's termination on July 9, 2015.

As mentioned, if the harassment does not culminate in "tangible employment action," an employer may escape liability by proving an affirmative defense. The affirmative defense requires the employer to prove: (1) the employer exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities that the employer provided. See Faragher, 524 U.S. at 807.

> While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

Id. at 807–08; see Vance, 570 U.S. at 424.

Diversified can assert this affirmative defense at trial, but genuine issues of material fact preclude resolving the affirmative defense at summary judgment. See Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 337 (4th Cir. 2010); Fairbrook Med. Clinic, P.A., 609 F.3d at 331; White v. BFI Waste Servs., Inc., 375 F.3d 288, 299 (4th Cir. 2004); Barrett v. Applied Radiant Energy

8

Corp., 240 F.3d 262, 265–69 (4th Cir. 2001); Smith v. First Union Nat'l Bank, 202 F.3d 234, 244–47 (4th Cir. 2000); Brown v. Perry, 184 F.3d 388, 395–98 (4th Cir. 1999); Lissau v. S. Food Serv., Inc., 159 F.3d 177, 181–82 (4th Cir. 1998); Reinhold v. Virginia, 151 F.3d 172, 176 (4th Cir. 1998). Thus, the court denies Diversified's motion for summary judgment on Perry's Title VII sexually hostile work environment claim.

B.

Perry alleges that Diversified retaliated against her in violation of Title VII after she formally complained about Norman's conduct on June 26, 2015. Diversified responds that it did not take action against Perry that a reasonable employee would find materially adverse. Rather, Perry quit her job on July 20, 2015.

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) she engaged in protected activity; (2) her employer took an action against her that a reasonable employee would find materially adverse; and (3) the employer took the materially adverse employment action because of the protected activity. See, e.g., Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 250 (4th Cir. 2015); Boyer-Liberto, 786 F.3d at 271; Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 410 (4th Cir. 2013); Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007); Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004), abrogation on other grounds recognized by Foster, 787 F.3d at 249; Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 543 (4th Cir. 2003); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 190 (4th Cir. 2001); see also Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 344–61 (2013); White, 548 U.S. at 67–70; DeMasters v. Carilion Clinic, 796 F.3d 409, 416 (4th Cir. 2015); Ricketts v. Logics, LLC, No. 5:15-CV-293-D, 2017 WL 4293406, at *5 (E.D.N.C. Sept. 27, 2017) (unpublished). An adverse employment action includes "a discriminatory act that adversely affects the terms, conditions, or benefits of the

9

plaintiff's employment." Holland, 487 F.3d at 219 (alteration and quotation omitted). A plaintiff establishes this element if the complained-of action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." White, 548 U.S. at 68 (quotation omitted).

The adverse employment action requirement seeks to differentiate the harms that work a "significant" detriment on employees from those that are relatively insubstantial or "trivial." Adams v. Anne Arundel Cty. Pub. Sch., 789 F.3d 422, 431 (4th Cir. 2015).

> [T]he antiretaliation provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee. The analysis depends on the particular circumstances of the case. All the tests, however, require that there be an adverse employment action, which denotes some direct or indirect impact on an individual's employment as opposed to harms immaterially related to it.

Id. (citation and quotation omitted).

On June 26, 2015, Perry formally complained to Engelhardt about Norman's sexual harassment. On that same date, Diversified suspended Norman and began investigating Perry's allegations. Perry continued to work at Diversified. On July 9, 2015, Diversified terminated Norman's employment. At some point between July 10, 2015, and July 20, 2015, a coworker allegedly asked Perry if she was menstruating, another coworker allegedly removed her water bottles from the plant's refrigerator, and another coworker allegedly blew marijuana smoke in a fan that was pointed in her direction. See [D.E. 22-1] 84–87, 91, 111–12. On July 20, 2015, Perry quit her job. See [D.E. 22-1] 111–12; [D.E. 22-5] 71; [D.E. 22-23].

Although the court condemns the alleged conduct of Perry's former coworkers between July 10, 2015, and July 20, 2015, the alleged conduct does not constitute adverse employment action by Diversified or constitute a constructive discharge under Title VII. See, e.g., Penn. St. Police v. Suders, 542 U.S. 129, 147–52 (2004); Adams, 789 F.3d at 431; Whitten v. Fred's Inc., 601 F.3d 231, 248–51 (4th Cir. 2010); Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 186–88 (4th Cir.

2004); Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255–56 (4th Cir. 1985). Thus, the court grants Diversified's motion for summary judgment on Perry's Title VII retaliation claim.

C.

In her complaint, Perry alleges wrongful discharge in violation of North Carolina public policy. See [D.E. 1-2] ¶¶ 31–42. The evidence demonstrates, however, that Perry quit her job on July 20, 2015. See [D.E. 22-1] 111–12; [D.E. 22-23]. Thus, Perry refines her claim to assert wrongful constructive discharge in violation of public policy. Diversified responds that North Carolina does not recognize a cause of action for wrongful constructive discharge in violation of public policy. See Whitt v. Harris Teeter, Inc., 359 N.C. 625, 625, 614 S.E.2d 531, 532 (2005) (per curiam) (adopting dissenting opinion at 165 N.C. App. 32, 43, 598 S.E.2d 151, 159 (2004) (McCullough, J., dissenting).

This court must predict how the Supreme Court of North Carolina would rule on this disputed state-law issue. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation and citation omitted).[1] In doing so, this court "should not create or expand a [s]tate's public policy." Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999). Moreover, in predicting how the highest

---

[1] North Carolina does not have a "mechanism . . . to certify questions of state law to its Supreme Court." Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013).

11

court of a state would address an issue that it has not yet resolved, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted).

The vast majority of federal district courts have construed Whitt to preclude a claim of wrongful constructive discharge in violation of North Carolina public policy. See McDonald v. Hanger Prothetics & Orthotics, Inc., No. 7:14-CV-91-D, 2014 WL 4978505, at *1 (E.D.N.C. Oct. 6, 2014) (unpublished); Littell v. Diversified Clinical Servs., Inc., No. 1:10CV152, 2013 WL 1951912, at *7–8 (M.D.N.C. May 10, 2013) (unpublished), report and recommendation adopted in part and rejected in part on other grounds, 2013 WL 5430518 (M.D.N.C. Sept. 27, 2013) (unpublished); Baldwin v. Tradesman Int'l, Inc., No. 5:12-CV-116-FL, 2013 WL 1192314, at *9 (E.D.N.C. Mar. 22, 2013) (unpublished); Jackson v. Weight Watchers Int'l, Inc., No. 3:10cv363, 2011 WL 1843223, at *3 (W.D.N.C. May 16, 2011) (unpublished); Parker v. Miller & Long Constr. Co., No. 5:10-CV-282-D, 2010 WL 5478466, at *2 (E.D.N.C. Dec. 30, 2010) (unpublished); Williams v. Target Corp., No. 3:10CV136-RJC-DSC, 2010 WL 2650847, at *3 (W.D.N.C. Apr. 22, 2010) (unpublished), report and recommendation adopted, 2010 WL 2650845 (W.D.N.C. July 1, 2010) (unpublished); see also Gallimore v. Newman Mach. Co., 301 F. Supp. 2d 431, 453–54 (M.D.N.C. 2004); Johnson v. Food Lion, LLC., No. 1:02CV904, 2003 WL 22741156, at *4 (M.D.N.C. Nov. 17, 2003) (unpublished). But see McHan v. Cherokee Cty., 2:06CV21, 2006 WL 3694540, at *2–3 (W.D.N.C. Dec. 13, 2006) (unpublished). Moreover, in an unpublished opinion, the North Carolina Court of Appeals has construed Whitt to preclude a claim of wrongful constructive discharge in violation of North Carolina public policy. See Clarke v. United Emergency Servs., Inc., No. CA07-592, 661 S.E.2d 55, 2008 WL 1723229, at *4–5 (N.C. Ct. App. Apr. 15, 2008) (unpublished).

12

This court agrees that Whitt precludes a claim of wrongful constructive discharge in violation of North Carolina public policy. Accordingly, the court grants Diversified's motion for summary judgment on Perry's claim of wrongful constructive discharge in violation of North Carolina public policy.

III.

In sum, the court GRANTS in part and DENIES in part Diversified's motion for summary judgment [D.E. 20]. The court GRANTS Diversified's motion for summary judgment on Perry's Title VII retaliation claim and state law claim. The court DENIES Diversified's motion for summary judgment on Perry's Title VII sexual harassment claim. The parties shall engage in a court-hosted mediation with United States Magistrate Judge Swank.

SO ORDERED. This 16 day of August 2018.

JAMES C. DEVER III
Chief United States District Judge